### UNITED STATES v. 25.4 ACRES OF LAND IN BOROUGH OF BROOKLYN, KINGS COUNTY, N. Y., et al.

#### Misc. No. 586.

District Court, E. D. New York.

Oct. 6, 1943.

Harry T. Dolan, Sp. Asst. to Atty. Gen. of U.S.A. (John A. Jordan, Sp. Atty., Department of Justice, of Brooklyn, N. Y., of counsel), for petitioner-plaintiff.

Cullen & Dykman, of Brooklyn, N. Y., (Sigourney B. Olney and Augustus J. Wheeler, both of Brooklyn, N. Y., of counsel), for Brooklyn Union Gas Co.

Douglas Swift and Austin J. McMahon, both of New York City (C. Elmer Spedick, and Austin J. McMahon, both of New York City, of counsel), for Delaware, Lackawanna & Western R. Co.

Robert H. Schaffer, Acting Corporation Counsel, of New York City (Julius Isaacs, Charles Bisberg, and Martin Holtzer, all of New York City, of counsel), for City of New York.

Nathaniel L. Goldstein, Atty. Gen. of N. Y. State (Warren H. Gilman, Asst. Atty. Gen., of counsel), for People of New York.

BYERS, District Judge.

This is an application by the record owners of damage parcels 2, 4 and 4A for an order directing the payment to them of the respective sums allocated to their properties which have been deposited by the government in the taking of the entire tract embraced within the title of this proceeding. The applicable statute is 40 U.S.C.A. § 258a.

The motion is contested by the People of the State of New York, and by the City of New York, as claimants, each being named as a defendant in the amended petition.

Under a stipulation the cause has proceeded to hearing, and evidence has been taken so that in effect there is to be an adjudication of the conflicting claims of title as though an action at law had been instituted to that end. This has been deemed to be a convenient method of disposing of the controversy, and since in form it is a motion the court has felt free to receive all evidence tendered by the parties, although if this were an action in ejectment, for instance, greater deference to the common law rules of evidence would have been requisite.

In making a decision, the effort has been made to examine the contentions of the parties with the same strictness that would govern the disposition of a controversy over title, for that is the essential nature of the proceeding; and yet it is difficult to stifle a realization that both the State and the City are merely reaching out for money which presumably takes the place of property, as to which neither has asserted any right whatever during the past ninety years. But for the accident of this condemnation, there is no reason to suppose that either of the adverse claimants would have initiated litigation to test the respective titles of the Brooklyn Union Gas Company as to damage parcel 2, or the Delaware, Lackawanna & Western Railroad Company as to damage parcels 4 and 4A. Since the former is a public utility and the latter a carrier, there can be no doubt that both the City and the State have collected divers taxes, franchise and otherwise, for many years from both, upon practical notice that the earnings upon which they were levied were based in part upon the operation of these companies upon the properties in question, so that inquiry into the subject-matter of this controversy would have been entirely natural if any actual misgiving were entertained as to the legal title of either to the real estate in question.

These are adjoining damage parcels and lie on the easterly side of Wallabout Bay (which is part of the East River) northerly of the Navy Yard; the extension of the latter to embrace the 25.4 acres referred to in the title gave rise to this condemnation proceeding.

These parcels are at the northerly end of the property being taken, and in part involve the same chain of title, which is the reason for treating them in one opinion. Prior to 1850 they were part of the land under water which lay offshore of the former Boerum and Remsen farms, which constituted the upland, title to which is not in dispute.

The land under water was bulkheaded, filled, developed, occupied and used in all

respects as though it constituted a part of the upland; legal title thereto is the subject-matter of this controversy.

### Damage Parcel No. 2.

The record title of the Brooklyn Union Gas Company dates back to 1895, when it acquired the property from Nassau Gas Light Company, which latter had been the record owner of part of the property since 1870, and of the balance since 1891.

This damage parcel is constituted of three former parts, known as the Shipman, Waterbury, and Cross properties; the first was the northerly section, and the third the southerly, separated by a triangular piece, having its apex to the west, known as the Waterbury piece.

Shipman, Waterbury and Cross, as owners, were the sources of title which was conveyed by the Nassau Gas Light Company to the Brooklyn Union Gas Company; as to Shipman and Cross, there were conveyances made to them by both the State and the City. As to Waterbury, the claim of title is based upon adverse possession against the City, commencing in 1855.

Since the land lay between high and low water, the State asserts that the federal government has taken its property, not that of the apparent owner in possession, for reasons later to be discussed. The City asserts that it is entitled to so much of the deposit as may be allocated to the former Waterbury parcel, since the asserted adverse possession never ripened into legal title; also it argues that, as against the State, it was and is the owner of the land between high and low water which it has not expressly conveyed to Cross and Shipman. The contentions thus broadly stated involve elements which require statement and discussion, as will appear.

The issue between the State on the one side, and the City and the record owners on the other, touching the title to the strip of land between high and low water lines is based upon the contention of the former that the Cornbury and Montgomerie Charters of 1708 and 1730, respectively, did not convey title to the Mayor, Aldermen and Commonalty of the City of New York to "all that aforesaid vacant and unappropriated ground lying and being on the said Nassau Island (alias Long Island) from high water mark to low water mark aforesaid, contiguous and fronting the said City of New York from the aforesaid place called the Wallabout to Red Hook aforesaid * * *".

The argument for the State runs that the purpose of the petitioners for the earlier charter was to insure to the City of New York the control of the ferry called Old Ferry to Nassau Island, and "that the bounds and limits of the existing ferry be somewhat extended * * * for the better improvement and accommodation of the said ferry" as the petition states.

That document in terms, however, prays for a grant of "all that vacant and unappropriated land, from high water mark to low water mark" etc., as above, for the reason stated.

The conveyance in the charter was in fee simple, and the habendum was appropriate to that end: "To have and to hold, all and singular the said ferry, vacant land, and premises, hereinbefore granted and confirmed * * * unto the said Mayor, Aldermen, and Commonalty of the City of New York and their successors and assigns forever; to be holden of us, our heirs and successors in free and common socage, as of our Manor of East Greenwich in the County of Kent, within our Kingdom of England; yielding, rendering and paying unto us, our heirs and successors for the same, yearly, at our Custom House of New York, to our collector and receiver-general there for the time being, at or upon the feast of the nativity of St. John the Baptist, the yearly rent or sum of five shillings, current money of New York".

The Montgomerie Charter of 1730 regrants and reconfirms prior charters and grants, including the Cornbury Charter.

It is true that the latter grants the ferry, i.e., a franchise to operate and run an important enterprise, but unless this court is prepared to hold that the conveyance of real estate, i.e., the strip of land between high and low water, was of a mere appurtenant to the franchise (which would constitute a legal solecism of no mean dimensions), the Cornbury Charter should be deemed to have accomplished that which its terms proclaimed, namely, the vesting in the then Mayor, Aldermen, and Commonalty of the City of New York of an indefeasible title to the land lying between high and low water marks on Long Island, between Wallabout and Red Hook.

The negative argument for the State is not supported by any decision, statute, or treatise, so far as the briefs disclose.

It would seem that so important a contention would have been presented in litigation between the State and the City at some convenient time since the adoption of the State Constitution in 1777 (a matter of 166 years), had there been good reason for seeking to establish in authoritative manner that the Cornbury and Montgomerie Charters were inadequate to accomplish their proclaimed objects.

For the City, attention is directed to Chapter 584 of the Laws of 1732, whereby the Governor, Council and General Assembly of the then Colony of New York enacted a statute recognizing and confirming the City Government of the Mayor, Aldermen and Commonalty (of the City of New York) as a corporate and politic body, and confirming all prior letters-patent, grants, charters and gifts under the great seal of the Colony made to the corporation, and the right to enjoy all prior gifts, charters, grants, powers, liberties and hereditaments theretofore granted thereunder.

Also, that in the State Constitutions of 1777, 1822, and 1846, it was provided that nothing in them should affect any grants of land in the State made by the Crown, or annul any charters made before October 14, 1775.

That the City has exercised its rights in the premises appears from the Map, City Ex. 5, showing leases and grants in fee of various properties within the affected area, between 1764 and 1865.

The opinion in New York Dock Co. v. Flinn-O'Rourke Co., 121 Misc. 155, at page 160, 200 N.Y.S. 347, at page 351, contains the following: "By the Cornbury Charter of 1708 there was granted to the Mayor, Aldermen and Commonalty of the City of New York, the fee of the land between high and low-water marks on the Long Island shore from Wallabout to Red Hook, and the Montgomerie Charter aforesaid contained a similar provision." See, also, Hoffman "Estate and Rights of the Corporation of the City of New York", Vol. 1, pp. 163, 164; and Gerard "Streets, Wharves and Land under Water", p. 60.

Recognition in express terms by the State of the City's title to the land in question is expressed in the following: Laws of 1836, Chapter 484; Laws of 1847, Chapter 271; Laws of 1851, Chapter 83.

In all of the foregoing, authority was given to individuals to erect docks, bulkheads, piers, etc., and the Act of 1836 established the permanent water-line of the then City of Brooklyn. The following reservation appears in each: "Nothing in this act contained shall be taken or construed to destroy, abridge, or in any manner impair the rights of the mayor, aldermen and commonalty of the city of New-York in respect to the land between the lines of high and low water along the Brooklyn shore of the east river; nor shall this act authorize any dock or wharf to be erected upon any of the lands belonging to the city of New-York, without the permission of the common council of said city first had and obtained."

The same reservation appears in the State's grant to Shipman (State Ex. 23) later to be noticed.

In view of this impressive showing of concurrence on the part of the Colony and later the State of New York in that which was by accurate and precise terms embodied in the Cornbury Charter, it ought to be apparent why this court can perceive no reason to undo what was accomplished a matter of 233 years before the institution of this proceeding.

It results therefore that this decision will proceed upon the theory that the City of New York was vested with title to so much of the land between high and low water marks as was adjacent to the upland constituting the Remsen and Boerum farms at all times material to this cause, and immediately prior to the incidents constituting the transition of title to the owners of an earlier day from whom the Gas Company and the Railroad Company assert title by succession.

It next becomes necessary to decide with reasonable certainty, where the high and low water marks were, as of the respective dates of the transmission of title, constituting the bases of the claims of the record owners. That is a highly controverted issue, because some of the properties will be found to have extended beyond any low water mark which can be established, which means that title to so much of the affected area was originally vested in the State of New York; the inquiry is then directed to grants or patents from the State to certain individuals in the chain of title and the legal effect to be given thereto.

If the grants were adequate instrumentalities to accomplish a transfer of title to those remote grantors of the record owners, the State is entitled to receive no part of the funds in court; if, on the contrary,

the grants must now be deemed to have brought about less than the transfer of title, a different result might ensue.

The City and the record owners assert that the high and low water lines shown on the Ludlam Survey of 1829–32 must be accepted for present purposes, while the State contends that a Map prepared by Loss in 1810 in connection with a cession of jurisdiction by the State to the United States of certain land under water, for the Navy Yard, shows the true margins which were further inshore, and should be deemed to embody the authentic dimensions of the respective limits of the City-owned strip.

It would be a simple matter to say that both may have been accurate when made, and that the latter must be accepted since it is the more recent of the two; but the State attributes a studied recognition of the Loss high and low water lines both to the City and to Caleb Shipman, the predecessor in title to a part of this damage parcel of the Gas Company as late as 1865, and argues that something in the nature of estoppel was thereby created which now operates to prevent either from now asserting that the Ludlam lines were correct in 1829–32.

It will be necessary to examine this question with some care:

The deed from the City to Shipman is City Exhibit 11, and Shipman's petition to the Land Board of the State is State Exhibit 19, and the grant which was issued pursuant thereto is State Exhibit 23. Authority to make the grant is contained in Chapter 281 of the Laws of 1864, which was passed by a two-thirds vote.

Annexed to Shipman's petition is a survey by L. L. Bartlett, City Surveyor, made in March, 1865, of the property for which he sought the grant, and shown thereon are "high water as per Loss Map 1810" and "low water as per Loss Map 1810".

It can be demonstrated from the evidence that there was no reason in 1864 either to impart vitality to the Loss water lines of 1810 or to show that they were inaccurate: Shipman's petition to the Land Board was made in order to obtain the State's sanction to his having filled in his land to the bulkhead line established by the Act of 1857, and so recites. This he had done under apparent legislative authority (Act of April 4, 1849) which was not passed by a two-thirds vote in the Senate; that is, but 21 out of 32 senators voted in favor.

It may be assumed for present purposes that the law failed of sufficient votes in the Senate to render its passage constitutional. The Commissioners of the Land Office were of the view that the 100 feet should be measured outshore from the low water line perhaps shown but not so entitled by Loss in 1810. Since a bulkhead line had been established in 1857, and Shipman had filled in his land to that line, he sought and obtained the sanction from the State for so doing, as is shown by the grant, State Exhibit 23, dated June 28, 1865, of land which is clearly described as being bounded on the west by the bulkhead line of 1857, and on the east by "the lands of said Caleb Shipman on the said shore".

In other words, one reason for the reference in the petition, State Exhibit 19, to the Loss lines in the Bartlett Survey may well have been to delineate the theory of the Commissioners of the Land Office, for the information of the Legislature, in order that the reason might clearly appear why special relief was sought as prayed in the petition.

No reason is apparent for the inclusion of the Loss lines in the Bartlett Survey, connected with the description of the property being granted by the State to Shipman; neither line established any boundary, nor was any measurement based upon any high or low water mark. The Survey would have been complete and informative without them, except for the reason above suggested.

■ The Bartlett Survey was also incorporated by reference, in the Shipman deed from the City, City Exhibit 11, dated July 6, 1865, but again the description of the land thereby conveyed, by metes and bounds, did not include reference to the location of the Loss or any other high and low water lines. The State of course gains nothing in support of its own case from the contents of the deed from the City to Shipman. The suggestion in the brief, that something in the nature of an estoppel can be spelled out of these uses of the Bartlett Survey, has no support in either reason or authority, for the State is not shown to have acted or refrained from acting in reliance upon Bartlett's inclusion of the Loss high and low water lines in his Survey of March, 1865. The argument for the State loses persuasive quality by reason of assertions which cannot be veri-

fied by reference to the documentary evidence:

(a) That the Loss high and low water lines are used as boundaries by the City in its deed to Shipman (main brief p. 75). This is just not so.

The conveyance is by metes and bounds as per map attached (Bartlett, March 1865), and while the designation is of a piece of land "between the line of original high water mark and the line of original low water mark", there is no reference to the Loss lines in the description; there is no statement that the "original" lines coincided with the Loss lines. That assertion is argumentative, not factual.

(b) That Shipman dealt with the State "using the Loss lines as controlling" (Supp. brief p. 3). Nothing in Shipman's petition bears out that assertion.

(c) That the 1849 "bulkhead line constitutes the easterly boundary of the State's grant to Shipman" (Supp. brief p. 4).

The grant describes a parcel beginning at a point in the 1857 bulkhead line, adjoining the Cross property, running thence (easterly) along Cross' northerly line about 118 feet to Waterbury's land, "thence northeasterly along same to the lands of said Caleb H. Shipman on the said shore, thence northerly along the front of said Shipman's land to the northerly boundary thereof". The last course indicates the easterly boundary of the land covered by the State's grant to Shipman, and contains no reference, either directly or by implication, to the 1849 bulkhead line which the State asserts without supporting proof, to have been 100 feet west of the Loss low water line.

Such assertions do not assist the court to reach a tenable decision in matters of this obscure nature.

It is concluded, therefore, that the evidence fails to establish that in 1865 the said data disclosed by Loss in 1810 possessed anything beyond historic interest; and that the said Bartlett Survey was not potent to discredit the Ludlam Survey of 1829–32, nor is it seen how any purpose so to do can be attributed to Bartlett—for the reasons above stated.

The Ludlam Survey constitutes City's Exhibits 3 and 4 and Brooklyn Union Gas Company's Exhibit 84. It is the basis of some of the grants made by the City of New York shown in City's Exhibit 5, and it was compiled for the sole and express purpose of delineating the then current high and low water lines on the Brooklyn shore, between Wallabout and Red Hook, defining the strip of land "which was granted to the City of New York by what is commonly known as the Cornbury Charter, and, also, the parts of said land that had been granted to various persons by the City of New York, and the parts remaining ungranted at the time of these Surveys".

The State assails these maps because they were made "for, and by direction of the Corporation of the City of New York for the purpose above stated".

It is said that they are to be regarded as self-serving declarations, although no attempt has been made to show that Silas Ludlam, City Surveyor, who practised his profession with his father Stephen Ludlam—who started in 1809—was acting other than as an independent contractor in making the maps in question; nor does the record contain the faintest suggestion that Silas was engaged in perpetrating a betrayal of his professional integrity for the sake of presenting a false or untrue delineation of the high and low water lines as he observed them. Much is sought to be made of the fact that the work was discontinued of making surveys south of President Street, to Red Hook. The lack of completion is referred to and the reasons given therefor, in a legend appearing in the compilation. The area not surveyed was remote from the premises in question and the disclosure of the circumstances tends to fortify the fidelity of the Surveyor, if that were necessary, which is not the case so far as this court is concerned.

The Ludlam high and low water lines as of 1829-32, so far as these damage parcels are concerned, are accepted and will be relied upon in making this decision. The Loss lines, as shown in 1810, were not required to be accurate for the purpose of the cession to the United States, but if deemed to be true when drawn, it is concluded that they ceased to indicate the margins of City ownership by 1829, nineteen years later.

That the City's title followed the shifting lines of high and low water, as the strip of land itself changed its location in obedience to the natural forces which determined its limits, is the settled law of New York. See Trustees, of Town of East Hampton v. Kirk, 84 N.Y. 215, 38 Am.Rep. 505; Nirdlinger v. Stevens, D.C.

262 F. 591; De Lancey v. Wellbrock, C.C., 113 F. 103; Scratton v. Brown, 4 Barn. & Cress. 488.

That the lines further shifted somewhat between 1829 and 1865 appears from the several exhibits, namely, Town Commissioners' Map of 1838 (State's Exhibits 15 and 15A; Brooklyn Union Gas Company's Exhibits 85, 86) and the D. Ewen Survey, B.U.Ex. 88; Clinton Avenue Opening Map, B.U.Ex. 90; Graves Map, B.U.Ex. 90, and William Day Survey, B.U.Ex. 91.

The foregoing are assembled in a composite Map, B.U.Ex.83, together with the Ludlam Survey of 1829, and there was no testimony offered to controvert the showing made in any of these surveys as to the high and low water lines; while they are not coincident by any means, they are sufficiently in harmony to dispel any possible illusion that the Loss lines were indicative of the high and low water margins of the City's title to the strip of land bounded thereby, down to 1849.

It satisfactorily appears from the evidence on the subject, which need not be discussed, that the water line shown on the Town Commissioners' Map of 1838 was in fact the then high water line, and it will be so found.

■ It results from the foregoing that the title of the State of New York to the land under water lying outshore from the Remsen and Boerum farms, so far as involved in this proceeding, did not embrace any land lying easterly of the low-water line as shown on the Ludlam Survey of 1829–32 at the time that Survey was made; nor thereafter when the State grants were made to Shipman and Cross, which must next be referred to.

As to Shipman, mention has already been made of the grant to him of June 28, 1865 (State's Exhibit 23), and the description will be seen to refer to "land lying under the waters of the East River in the Ninth Ward of the City of Brooklyn". The westerly boundary is the bulkhead line established by 1857 legislation, and the easterly boundary is Shipman's land "on the said shore". The southerly boundary is John A. Cross' property, and James Waterbury's; and the northerly is described as "lands of Harms and others".

As to so much of damage parcel 2 thus comprehended, there is no controversy respecting the nature of the conveyance; that is, no right is asserted in the nature of reverter, since this was a "beneficial enjoyment" grant.

The Patent to Cross was different in terms, and the contention of the State is that it constituted a mere franchise to fill in lands and erect docks "necessary to promote the commerce of the State", etc:, and that the State retained the fee title to the affected land, and is now entitled to the award representing so much of this damage parcel as was covered by the Patent to Cross.

There has been no attempt by the State to demonstrate by testimony that Cross failed to perform the duties prescribed in the Patent, or that any of his successors in title, by act or omission, can be charged with similar dereliction.

■ It is not too plainly stated in the brief for the State, but by inference the contention is offered that the taking by the federal government is incompatible with the carrying out of the terms of the grant to Cross, and since he did not receive a title in fee, the State must now be awarded the present value of that part of the property covered by his Patent. This means that the record owner should forfeit the value of its property to the State, because the federal government has condemned it for the purposes of the Nation.

It would be difficult to conceive of a proposition more completely devoid of practical merit.

It is the present view that in the legal sense the contention is equally infirm.

The Patent to Cross was dated July 10, 1851, and is State's Exhibit 10. In terms it did not convey title to the land under water which was owned by the State for the benefit of all its citizens; see People v. Steeplechase Park Co., 218 N.Y. 459, 113 N.E. 521, Ann.Cas.1918B, 1099.

The instrument conferred upon Cross the right, power and authority to fill in the land under water therein described, and to erect a dock or docks thereon "necessary to promote the commerce of the State", and the authority to collect dockage from users according to legislative regulation.

As has been said, he performed the tasks ordained in the Patent; that is, he built a dock or docks, and placed fill on top of the land under water as far as the outer aspect of the dock, and thus perfected his franchise.

That which had been of no commercial value was transformed into a permanent

and lasting property whereby the interests of commerce were promoted, and the welfare of the people of the State was advanced. That the property so evolved became a source of earning power to its successive owners means that it also made its contributions to the public treasury through the payment of various forms of taxes. The start was made on that career, if property may be thought of as having a career, about 90 years before this proceeding was instituted.

The terms of the grant were in accord with the pattern of the legislation which has been interestingly developed in the brief filed by the Attorney-General; but the attempt to disparage the title of the record owner by reason of the careful restrictions imposed upon the Commissioners of the Land Office, and their adherence thereto, is something less than convincing in view of the decisions of the Court of Appeals of the State, in dealing with similar causes. See Matter of the City of New York (Upper New York Bay), 246 N. Y. 1, 157 N.E. 911, 917.

A brief quotation may be permitted: " * * * we feel that we are now justified in holding in accordance with these authorities that where the grant or patent merely recites that it is for the purposes of commerce, the patentees and grantees, despite this recital, take unrestricted titles, subject, of course, to such regulations as the State in its sovereign capacity may make for the general regulation of commerce and navigation * * *."

Even though there was no conveyance in terms of the land under water, but a grant only of the right to build bulkheads and docks and to fill in, the rule is the same; see First Construction Co. v. State of New York, 221 N.Y. 295, 116 N.E. 1020.

Here the court writes (page 315 of 221 N.Y., page 1025 of 116 N.E.): "We may assume that as necessary incidents to this privilege it was implied that when the privilege had been exercised and the lands filled in the beneficiary of the grant would become the owner thereof. This implication was necessary in order to secure the enjoyment and fruits of the privilege which was granted,· and this is the view which was correctly adopted by the learned referee. See, also, Williams v. Mayor, etc., of N. Y., 105 N.Y. 419, 11 N.E. 829."

The State urges that the case first above cited does not foreclose its contention, since it was not a party to that cause.

None-the-less, that was in essence a decision of a cause in rem, involving real property not to be distinguished in nature from this, and the reasoning is wholly persuasive.

It is said also by the State, that the latter case involved the construction of an act of the legislature, Chapter 491 of the Laws of 1884, which ratified previous ones which had failed of a two-thirds vote and were therefore unconstitutional. That is true, but it does not impair the validity of the reasoning which is as applicable to a patent granted under legislative authority, as to an act of the Legislature itself.

Even if the Patent to Cross was properly denominated as a mere franchise, and by its terms subject to forfeiture if the conditions imposed were not performed within a fixed or reasonable period of time, when they had been performed, nothing remained to the State to lay hold of thereafter, including the time when the federal government ousted the record owner.

It matters little if it be conceded, as the State contends, that what was obtained by Cross was a property right subject to the collateral limitation that this land underwater be used by Cross (and his successors) only for the purpose of promoting the commerce of the State. Whatever may have been its correct technical appellation, it was something quite tangible and distinctly more substantial than a mere mental concept; it has been taken by the federal government, and payment therefor must go, to the successors in title to the patentee, for there has been no showing that the conditions subsequent, i. e., the filling in and building of docks and bulkheads, have not been performed; nor has the State undertaken hitherto by entry or ejectment so to demonstrate.

It is considered therefore that the said Patent to John A. Cross was effectual to confirm to him and to his successors in interest, ownership of the lands under water described therein, once he had performed the said conditions subsequent, and that, for the purposes of this cause, title thereto is deemed to be indefeasible so far as the record owners are concerned.

Thus the devolution of title to the former Shipman and Cross properties embraced in damage parcel 2 is found to be complete and effectual in the record owner, as against the claims of the State of New York. No claim is made by the latter to the Waterbury parcel, and the following:

discussion will involve the conflicting claims of the Gas Company and the City to that property.

It should be said that title to the land involved between high and low water lines according to the Ludlam Survey, so far as the Shipman and Cross elements are concerned, was conveyed by the City to the former by quitclaim deed (City's Exhibit 11) dated July 6, 1865, and by similar conveyance to the latter (City's Exhibit 6) dated December 9, 1852.

Therefore the Waterbury parcel alone is the subject of controversy between the City and the Gas Company.

That property is not easily to be identified on the damage map except with the aid of a supplemental diagram attached to the brief of the record owners; it was part of the Boerum farm, and was partitioned to Barnet Boerum in 1849 and is shown on City's Exhibit 10, the map filed by the Commissioners in partition in 1850, as lot A. The upland is colored yellow, but the map clearly indicates that the rectangular lot as partitioned ran to the low water line, for on that the legend appears "Divided equal on this line".

Barnet Boerum understood that his title extended so far, and under date of April 30, 1851, filed "objections" to the grant sought from the Commissioners of the Land Office by John A. Cross of the property which was later embraced in the Patent to him of July 10, 1851 (State's Exhibit 10) and which cut off diagonally much of the south and all of the westerly portion of the lot A as partitioned to Barnet Boerum.

He alleged that he had begun an action of ejectment against Cross as to a triangular parcel of land under water having as its southerly boundary the original division line between the Boerum and Remsen farms, beginning at the high water line and prolonged to the end of Cross' dock; its westerly side being 162 feet; and its northerly side running to the place of beginning. The ejectment suit was dismissed and the "objections" were ignored, but Barnet Boerum had asserted his claim of right to this triangle which constituted a part of the land lying under water at high tide being the offshore portion of lot A on the said partition map, and the Waterbury parcel was comprehended therein; since it was between the high and low water marks, title was actually vested in the City, but ownership was asserted by Barnet Boerum based upon the action of the Commissioners in Partition.

It is unnecessary to trace record title to the Waterbury parcel to the Gas Company, as devolution thereof is not in dispute. The City's position is that title by adverse possession has not been established by the requisite clear and cogent proof; see Cutting v. Burns, 57 App.Div. 185, 68 N.Y.S. 269; Staples v. Schnackenberg, 148 App. Div. 161, 132 N.Y.S. 1092; Pines v. Traktman, 109 Misc. 680, 178 N.Y.S. 90, affirmed 189 App.Div. 904, 178 N.Y.S. 90.

It will be assumed that such is the necessary showing on the part of the record owner. In that connection it is to be observed that the City has offered nothing to controvert the evidence submitted by the Gas Company, but contents itself merely with disparaging comments thereon.

■ The record owner rested under the necessity of demonstrating (see Belotti v. Bickhardt, 228 N.Y. 296, 127 N.E. 239) that adverse possession on its part and that of its predecessors in title must needs establish:

A. Possession hostile to that of the true owner, under claim of right.

B. Actual possession.

C. Open and notorious possession.

D. Exclusive possession.

E. Continuous possession.

■ The proof is deemed to conform to the foregoing in that: Barnet Boerum's possession was hostile to that of the City, as has been seen. It was under a claim of right based upon the action of the Commissioners in Partition as shown by the map filed by them, City's Exhibit 10; and by his "objections" filed with the Commissioners of the Land Office to a grant by the State to Cross of part of property which he claimed to be his; and by his unsuccessful action in the courts against Cross.

Boerum's possession of the land under water remaining to him after the grant to Cross was actual because in 1855 according to the Harbor Commissioners' Map, B.U. Exhibit 55, a bulkhead is shown 100 feet outshore from the apex of the triangle forming the westerly end of this parcel. Inside that bulkhead the map shows actual filling. There is no proof as to when the filling had been done, but the survey was made between July and October, 1855, so the filling must have antedated the former

month, which was some 86 years before title vested in the federal government.

Since the testimony of living witnesses was not available concerning occurrences so remote, recourse must be had to the best available and authentic data, which possesses the capacity to persuade, if some understanding is to be reached touching this property and its history.

By deed dated December 20, 1856, Barnet Boerum conveyed said lot A to Magdalene Boerum, and the description is consistent with his claim of title to the land under water as partitioned to him, for the westerly course runs "northerly along the East River or Wallabout Bay to the southerly side *under water* (italics supplied) of said piece of land colored red and designated by letter C on said map (the Partition Map)".

Obviously the foregoing would have been meaningless, had Barnet Boerum not intended to accord to lot C, which was immediately north of lot A, its prolongation to low water mark as depicted on the Partition Map; and that in turn would have been unnecessary except to proclaim ownership of his own similar property, lot A, extending to the low water line as shown on the Partition Map.

Magdalene Boerum mortgaged the property to Waterbury, and he later obtained title through a foreclosure proceeding; see Referee's Deed of June 18, 1862, B.U. Exhibit 37.

Thus the property came to be known as the Waterbury parcel. While all descriptions thus far were of the entire property as partitioned to Barnet Boerum, it will be understood that a diagonal cutting off of a portion thereof was accomplished by the conveyances from the State in 1851 and the City in 1852 to Cross, heretofore mentioned, so that the former rectangle constituting partition lot A as claimed by Barnet Boerum was reduced to a triangular shaped parcel having its base on Kent Avenue, and its apex at about the low water line shown by the Ludlam Survey of 1829–32.

The further requirements of open, notorious, exclusive, and continuous, possession have been convincingly shown, by evidence that the land was soon built upon, and as early as 1862 was leased and occupied by a tenant of Magdalene Boerum. In 1862 Waterbury leased the property (B. U. Exhibit 67) and the tenants agreed to keep "the buildings erected upon the prem-

ises insured against loss or damage by fire", etc.

The subsequent leases are in the record and continuously recite the presence of buildings upon the demised premises.

On March 31, 1882, the Executors of Waterbury conveyed the said triangular piece to Brewster, and this is the first deed which describes the property by metes and bounds, and the description contains the following: "* * * being the premises intended to be conveyed to James M. Waterbury in his lifetime by Theodore F. Jackson, Referee, by deed", etc. Thus the description in the foreclosure deed, which was of lot A on the Partition Map, was explained or interpreted, so as to indicate that the Waterbury parcel was included in that conveyance, and the fact was recognized that part of the original partition lot A had been lopped off as has heretofore been recited.

This explains but scarcely justifies the statement in the City's brief that "no instrument prior to 1882 purport(s) to convey the 'Waterbury' parcel".

The instruments heretofore referred to do indeed so purport, plus that which Barnet Boerum asserted that he owned, namely, all of the land under water outshore of the upland to low water mark, which upland was colored yellow on the Partition Map.

Occupancy of the property under the respective leases is not questioned by the City, and it could not well be, since there is an unbroken chain of tenancies at least through 1882, when the deed from Waterbury's Executors recites that the conveyance was subject to a lease to Myer and the rights of the tenants in buildings and fixtures on the premises. B.U. Exhibits 70 to 79, inclusive, embrace tax maps and assessment rolls beginning in 1851 and continuing until 1942, and they reveal, of course, that during these years this property was assessed as in private ownership and not as City-owned real estate. It is not presently understood why such City records are not admissible in evidence or why they should be ignored, at least to the extent of the indication they yield that as early as 1866 this property was assessed by the City as "a lot and factory" of the assessed valuation of $9,000.00.

Water bills were paid at least from 1860, which is the earliest available record, and in that year the description is "stable, office". In 1862 it is "stable, office, soap factory". Thereafter and down to 1873,

except as to 1870, the property is described as factory, or soap factory.

These records are incompatible with ignorance on the part of the City concerning the existence and character of this property, and that it was not land under water or wharves, docks, or bulkheads. The bearing of that comment will appear presently.

So far as possession is concerned, the City asserts with confidence, that the payment of taxes is not deemed to be evidence, for it is not binding on the City, and its best citation is: Archibald v. New York Central, etc., R. Co., 157 N.Y. 574, 52 N.E. 567.

The later view seems to be that, standing alone, the payment of taxes does not prove possession, but taken with other evidence it should be considered in deciding the issue; see People v. Ladew, 237 N.Y. 413, 143 N.E. 238; City of New York v. Wilson & Co., 278 N.Y. 86, at page 95, 15 N.E.2d 408.

Payment of taxes is at least compatible with a claim of ownership and even the City does not argue to the contrary, and so it is thought that, on that aspect of the case at least, the tax and water payments are properly in the record.

The next argument of the City is that, since under Chapter 574 of the Laws of 1871 and Chapter 335 of the Laws of 1873 as expounded in City of New York v. Wilson & Co., supra, lands under water of the City of New York became inalienable, the City must have so much of the funds on deposit as represents the Waterbury parcel. Much space is given in the briefs to the argument of this proposition.

It is urged that the statutes applied to the City of New York as then constituted, namely, Manhattan Island, and cannot be supposed to have affected the City's land between high and low water on the Brooklyn shore as granted by the Cornbury Charter and confirmed by that of Montgomerie.

Further, that these laws were of prospective operation and could not be interpreted so as to do more than create a disability to convey, which did not toll the statute of limitations which was running against the City from at least 1855 according to the showing on the Harbor Commissioners' Map.

These arguments are more than plausible and perhaps sufficiently meet the contentions of the City.

In addition, there is the practical reason, that in 1871 this property had not been land under water for sixteen years. The City's own records indicate that it was factory property in 1870, 1871, 1872 and 1873. In 1870 it had an assessed value as factory property of $12,000.00. For the year 1871 the water bills and the tax bills both so designate the parcel, and the current effort to bring it under a statutory classification of land under water demonstrates strikingly how hard pressed the City is for reasons to justify its claim to some of the money which this court is called upon to distribute.

There is another matter which the City conveniently ignores: On July 6, 1865, 10 years after Barnet Boerum had filled in his land, the City made a quitclaim deed to Caleb H. Shipman of the Shipman parcel. The description is by metes and bounds, and part of the southerly boundary is stated thus: "thence easterly *along the land of James M. Waterbury* about Two hundred and fifty-two feet to the westerly side of Kent Avenue * * *". (Italics supplied.)

At least it is clear that in 1865 the City knew that Waterbury was the owner of upland, not land under water. This is consistent with the City's collection of taxes from Waterbury in 1866 upon "a lot and factory".

It was decided in Matter of City of New York, 217 N.Y. 1, 111 N.E. 256, that title to such property as this can rest in adverse possession, and as possession is shown since 1855 at least, it would seem that there is no substantial basis for questioning the title of the present record owner as of September 19, 1941. City of New York v. Wilson & Co., supra, is not to the contrary.

If the Laws of 1871 and 1873 were deemed to affect this lot, there would be no hesitancy on the part of this court in deciding that, since the adverse possession started at least sixteen years prior to 1871, those statutes are of no present avail to the City to defeat the title of the Brooklyn Union Gas Company in and to the so-called Waterbury parcel, and the 15-year statute of limitations, Sec. 34, Civil Practice Act, would operate to defeat the City's claim.

It results therefore that as to damage parcel 2 the Brooklyn Union Gas Company is entitled to receive the sum payable as compensation therefor in this proceeding.

### Damage Parcels 4 and 4A.

The Delaware, Lackawanna & Western Railroad Company, hereinafter called the Railroad, is the record owner of these parcels, and its claim is also contested by the People of the State of New York, and by the City of New York, upon the same general grounds as in the case of damage parcel 2.

Damage parcel 4 comprises land lying directly south of parcel 2 and is bounded on the north by Cross Street as projected, on the east by Kent Avenue and Washington Avenue, on the south by Wallabout Canal, and on the west by Wallabout Bay or the East River. Damage parcel 4A is a strip varying from 20 to 5 feet in width, running along the northerly side of Wallabout Canal, and represents the difference between a bulkhead line as projected and the face of the bulkhead as erected in 1867.

Damage parcel 4 constituted land under water adjoining the upland farm of Remsen prior to 1850, and John A. Cross acquired title to the greater part thereof from the Executors of Remsen as to the upland; and from the City of New York as to the adjacent foreshore between high and low water lines by deed dated December 9, 1852 (City's Exhibit 6); and as to the land below the low water line, by grant from the State under date of July 10, 1851 (State's Exhibit 10).

It is unnecessary to repeat what has been written concerning the findings and conclusions of this court in reference to damage parcel 2 as to the efficacy of the Ludlam Survey of 1829 to establish the high and low water lines from that date until 1851, and the limits of the City's ownership of that strip of land on Wallabout Bay; nor as to the legal effect to be attributed to the Patent or grant from the State to Cross so that his successor in title, the Railroad, is held to be entitled as against the People of the State of New York to the sum to be paid by the federal government for the taking of so much of damage parcel 4 as was formerly the property of John A. Cross.

The remaining part of damage parcel 4, known as the "Beyer Parcel", comes down through a different chain of title, which is sought to be defeated by the City for the alleged failure of proof of adverse possession prior to 1871, and by the State on the theory that its property extended to the Loss high water line of 1810. That claim has been found to be untenable, and equally so as to the Loss low water line.

Again, as to this entire damage parcel, there is no issue made concerning the devolution of record title; and again there is no affirmative evidence offered to controvert that which the record owner has submitted concerning possession during the ninety years which elapsed between 1851 and the vesting of title in this proceeding.

The former Beyer parcel was in the southerly part of damage parcel 4, triangular in shape, and having its apex at the westerly side of Washington Avenue, along which ran the parcel's easterly side; the base was coincident with the northerly side of Wallabout Canal, and its westerly side was the center of the projected Clymer Street as extended to the Canal. It was formerly part of the Remsen farm, being in part foreshore and mostly land under water, and was sold to Underhill in 1850; in January, 1851, he contracted to sell it to Green (R.R.Exhibit 31), who undertook to "finish and complete the dock and bulkhead forming part of the aforesaid premises similar to the adjoining and belonging to John A. Cross, Esq".

Title was to close May 1, 1851, and it is a fair inference that construction of a bulkhead was under way at the date of the contract, and the filling in the land to that structure was in process, for the consideration was $24,000.00, a substantial sum of money at that time.

The Act of the Legislature of April 4, 1849, Laws 1849, c. 209, heretofore referred to, purported to grant to Remsen's heirs and devisees the right to fill in and keep and maintain forever a bulkhead, dock and wharves adjacent to Remsen's lands in question, and pursuant to this apparent authority the said construction was undertaken and completed. Since the legislation apparently failed of a two-thirds vote by one vote in the Senate, it lacked constitutional sanction, but no difficulty is presently encountered in holding that what was done pursuant thereto was under a color of right in the then owner or owners of the Beyer parcel to bulkhead, fill in, and enter into possession of the land thus made.

Underhill entered into an agreement with Samuel P. Townsend (R.R.Exhibit 32) on January 15, 1851, to sell this property for $22,000.00 to him; the vendor contracted "to grade the lots to the grade of the streets and dock adjoining where the said dock is completed and to complete the dock and excavate the mud and sand in front to a depth of seven feet at low water" and

"to dig the cellars if required on Kent Avenue for the houses".

On February 3, 1852, said Townsend made an agreement with Wilbur, John P. Townsend and Hallenbeck whereby in consideration of $40,000.00 money and property, the said contract of January 15, 1851, was assigned to those three persons together with the right, title and interest of Samuel P. Townsend in the said tract "together with all improvements made thereon".

By mesne conveyances the property passed to the Railroad in 1907.

The records of the Tax and Water Departments of the City of New York are as explicit as in reference to damage parcel 2 concerning buildings, shops, coal yard, stable, etc., on this property from 1853 to the date of taking hereunder, and as has been seen the building of the dock and filling in started in 1850, or by January of 1851.

Thus for a period of ninety years possession by the predecessors in title of the record owner has been under color of right, open, notorious, exclusive and adverse to the City of New York, starting twenty years prior to 1871, and title by adverse possession had been acquired before 1871.

It is unnecessary to repeat what has been written in reference to the prior damage parcel, concerning the effect of the Acts of 1871 and 1873 relied upon by the City. This parcel had not been land under water since before 1851, nor had it been in the possession of the City since that time; on the contrary the municipality had been collecting taxes since 1851 and water rates since 1860 from the record owners thereof, upon the theory that this was improved real estate containing shops, stables, dwellings, etc.

To now seek to classify it as land under water in 1871 so as to bring it within the terms of Chapter 574 of the Laws of 1871 (passed April 18, 1871) is to attempt the impossible, so far as this court is concerned.

██ Quite apart from the foregoing is the bearing of the Statute of Limitations, found in Section 37 of the Civil Practice Act. The period is fifteen years, although where the duration of occupancy by one in possession of real property at that time was more than fourteen but less than nineteen years, the right to bring action to assert the title against which the limitation would be a bar, was extended for one year from the taking effect of the 15-year stat-ute. This and cognate sections (34 to 46) protected existing rights but established a new basis of limitation concerning actions to recover real property, a subject exclusively within the province of the Legislature of the State. That the power was properly exercised follows from the decisions in: People v. Turner, 145 N.Y. 451, 40 N.E. 400; Turner v. New York, 168 U. S. 90, 18 S.Ct. 38, 42 L.Ed. 392; Meigs v. Roberts, 162 N.Y. 371, 56 N.E. 838, 76 Am. St.Rep. 322.

If the statute of 1871 interposed a disability, the latter did not reach back to the time when the adverse possession started, but spoke only from and after the date of its creation, so that the period of limitation must be computed from the year 1851, when the bulkhead and filling are shown to have been in the process of completion, and the adverse possession to have been inaugurated. Thus the 20-year statute as it existed prior to 1932 was satisfied.

If the possession were deemed to date only from 1853 in spite of the assessment roll of 1851, then the 15-year statute would still bar the City's claim.

It results therefore that, as to damage parcel 4, the compensatory award must be made entirely to the Railroad as owner of the premises at the time of the vesting of title in this proceeding.

## Damage Parcel 4A.

This is a strip of land running along the canal from Wallabout Bay at the westerly end, where the width is 4 or 5 feet, to the Washington Avenue end, where the width is from 18 to 20 feet. It is the result of a discrepancy between the position of the bulkhead (which dates back to 1867) constituting the northerly line of the canal opposite the former division line between the property of Abraham A. Remsen and the U. S. Naval property, and the line of the "Channel as Adopted" according to map annexed to a report of 1848 by Commissioners appointed in connection with a property line dispute between the respective owners.

The bulkhead as erected impinged beyond the adopted line by the margin stated, for reasons not appearing in this record. The "Adopted Line" is shown upon the Stoddard Map of 1848, and certain deeds of lots bordering on the canal, between 1850 and 1900, contain descriptions referring to the "Adopted Line" and to the "Stoddard Map"; others refer to the Dar-

ling Map of 1854, which is City's Exhibit 9.

The canal frontage comprehended in this damage parcel was embraced entirely in the former Cross and Beyer tracts, and requires consideration apart from them only because it has been separately designated on the damage map, and because possession was not based upon the inclusion of this property within the description contained in the City's deed to Cross, or the grant from the State to him. So much of damage parcel 4A as was erected upon the strip bounded by the high and low water lines of the Ludlam Survey belonged to the City; and so much as lay beyond the low water line belonged to the State, and adverse possession on the part of the predecessors in title of the Railroad is definitely shown as to the entire parcel, in 1867, on the McElroy Map, Railroad Exhibits 12 and 13, made in connection with the opening of Washington Avenue.

A bulkhead enclosing part of this parcel is shown on Sheet 16, Harbor Commissioners' Map of 1857, and, as to so much, possession is deemed to have been shown in that year.

Since the strip now being considered was physically a part of the former Cross and Beyer parcels, what has been decided with reference to damage parcel 4 necessarily applies to 4A except that it may be requisite to consider more closely the possible impact of Chaper 574 of the Laws of 1871 and Chapter 335 of the Laws of 1873, on the theory that, even if this strip was not land under water, it could be thought of as a pier or bulkhead owned by the City in 1871, and inalienable after the effective date of the former statute. That argument, however, is avoided as to the City by the running of the statute of limitations, which started at the latest in 1867 as to the entire parcel, and was not tolled by the disability created four years later.

As to the State, and so much of the strip as lay beyond the low water line, Section 31, Civil Practice Act, stands in the way. That section provides that the people of the State will not sue a person "for or with respect to real property, or the issues or profits thereof, by reason of the right or title" unless the cause accrued within forty years, or rents or profits have been received by the people within that period. Since neither of the exceptions apply, it results that no claim has been established on the part of the people of the State of New York, to so much of the compensation as is payable to the record owner with respect to damage parcel 4A in this proceeding.

The failure to construe Chapter 574 of the Laws of 1871 and Chapter 335 of the Laws of 1873 so as to restrict their operation to the territorial limits of the City of New York as it was constituted during those years, has been deliberate; it has seemed that a decision which might be of far-reaching consequence with respect to titles on the waterfront of Brooklyn should proceed from the Court of Appeals of the State of New York. In deference to that belief, rather than because any real doubt is entertained that such would be the holding, in view of subsequent legislation dealing with the old City of Brooklyn, it has seemed expedient to place this decision upon the grounds above stated.

It is concluded and decided that, as to damage parcel 2, the entire compensation is payable to Brooklyn Union Gas Company as owner of the premises; and as to damage parcels 4 and 4A to the Railroad as owner of the premises.

Settle order.